## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Ozinga Bros., Inc., an Illinois corporation, and Ozinga Cement, Inc., formerly known as Chicago Cement, Inc., an Illinois corporation | ) ) ) | |
| | ) | Case No.  19 CV 7825 |
| Plaintiff, | ) ) | Judge: |
| vs. | ) ) | Magistrate Judge: |
| Holcim (US) Inc., a Delaware corporation, and Cutrara & Company, Professional Corporation, an Illinois corporation | ) ) ) ) | |
| Defendants | ) | PLAINTIFFS DEMAND TRIAL BY JURY |

## COMPLAINT

Now comes the Plaintiffs, OZINGA BROS., INC., an Illinois corporation, and OZINGA CEMENT, INC., formerly known as Chicago Cement, Inc., an Illinois corporation, by its attorneys, Timothy S. Breems, Sr., Scott Nelson and Paul N. Reidy of Ruff, Freud, Breems & Nelson Ltd., and Michael F. Iasparro and Richard S. Porter of Hinshaw & Culbertson LLP, complaining of the Defendants, HOLCIM (US) INC., a Delaware corporation, and CUTRARA & COMPANY, PROFESSIONAL CORPORATION, an Illinois corporation, and state as follows:

## INTRODUCTION

1.      Portland cement is the ingredient that with water forms a paste to bind sand and stone to form ready mix concrete.

2.      Plaintiffs, Ozinga Bros., Inc. and Ozinga Cement, Inc. (collectively, "Ozinga"), as a producer and supplier of ready mix concrete and as a material hauler, respectively, in the Chicago metro area, entered into a Cement Supply Agreement dated June 24, 2014, as amended on March 29, 2015, (collectively, the "Cement Supply Agreement") with defendant, Holcim (US) Inc. ("Holcim"), a producer and supplier of Portland cement, to purchase certain yearly minimum

amounts of Portland cement over the 10-year term of the Agreement. A copy of the Cement Supply Agreement and Amendment No. 1 to Cement Supply Agreement are attached hereto as Exhibit A.

3.    In violation of Section 1 of the Sherman Act, 15 U.S.C. §1, Holcim conspired with Defendant, Cutrara & Company, Professional Corporation ("Cutrara"), an accounting and consulting firm, to establish and maintain, and force Ozinga to pay, an anticompetitive price for Portland cement that is inconsistent with market realities.  In furtherance of their conspiracy, Holcim and Cutrara agreed that Cutrara would review Ozinga's books and records under the guise of performing a price audit of competitive pricing for Portland cement as contemplated by the Cement Supply Agreement.  Rather than conducting an audit consistent with generally accepted principles or with the commonly understood meaning of relevant terms or with Holcim's and Ozinga's well-established course of dealing, however, Cutrara conspired with Holcim to conclude in the Cutrara Price Audit Report that Cutrara could not determine a competitive price for Portland cement, thus forcing Ozinga to purchase cement from Holcim at an anticompetitive and arbitrarily high price.  The Cutrara Price Audit Report ("Cutrara Report") is attached hereto as Exhibit B.

4.    In addition, Holcim, by failing to negotiate a competitive price for Portland cement in good faith, by ignoring the course of dealing between it and Ozinga, the mutually and commonly understood meaning of relevant terms of the Cement Supply Agreement, and by refusing to recognize Qualified Suppliers of Portland cement, has breached the Cement Supply Agreement. Moreover, if Holcim's new interpretation of the relevant competitive pricing terms of the Supply Agreement are accepted, it has rendered those material terms meaningless and impossible to comply with, requiring reformation to determine the essential terms of the Cement Supply Agreement relating to determination of Competitive Price.

5.    In addition, Cutrara, by agreeing with Holcim to facilitate and assist Holcim in establishing and maintaining an anticompetitive price for Portland cement, and agreeing with

Holcim that it would not determine a Competitive Price or recognize Ozinga's Qualified Suppliers, despite being fully aware of the terms and conditions of the Supply Agreement and the course of dealing between Ozinga and Holcim, tortiously interfered with the Supply Agreement to the detriment of Ozinga.

6.     In addition, upon information and belief, Holcim, for at least the past two years, and likely longer, has engaged in unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. §13(a), by charging a competitor of Ozinga's in the ready-mix concrete industry substantially lower net prices for Portland cement under the guise of a product swap or bartering agreement or arrangement, with the actual price charged said competitor being at or near cost rather than at or above the anticompetitive price charged Ozinga.  Upon information and belief, a primary purpose of this arrangement and contrived pricing scheme has been to maintain Holcim's anticompetitive pricing dictated to Ozinga under the guise of the Cement Supply Agreement, and to avoid the Most Favored Price clause of the Cement Supply Agreement, which requires Holcim to give Ozinga, at all times, a Sales Price equal to or less than the lowest price at which Holcim has sold Product within the Chicago Metro Area.

## THE PARTIES

7.     Plaintiff, Ozinga Bros., Inc., is an Illinois corporation headquartered in the state of Illinois.

8.     Plaintiff, Ozinga Cement, Inc., is an Illinois corporation headquartered in the state of Illinois.

9.     Defendant, Holcim (US), Inc., is a Delaware corporation headquartered in the state of Michigan.

10.     Defendant, Cutrara & Company, Professional Corporation, is an Illinois corporation headquartered in the state of Illinois.

3

## JURISDICTION AND VENUE

11.     This Court has original subject matter jurisdiction over Counts I and V of this Complaint pursuant to 28 U.S.C. § 1331, which provides that the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1337(a), which provides that the district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraint or monopolies.

12.     This Court further has subject matter jurisdiction over Count II, the state law breach of contract claim for which Ozinga seeks relief against Holcim, pursuant to 28 U.S.C. §1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs and because the dispute is between citizens of different states.

13.     This Court further has supplemental jurisdiction over Counts II, III and IV, the state law claims for which Ozinga seeks relief, pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391(a), because Ozinga's main offices, where many of the events described herein occurred, are located in the Village of Mokena, County of Will, State of Illinois.

## ALLEGATIONS COMMON TO ALL COUNTS

15.     Ozinga is a leading producer and supplier of ready mix concrete in the relevant market, defined by the Cement Supply Agreement as "the Chicago metro area, as defined by the [United States Geological Survey]" (the "Relevant Market"). (See Exhibit A, Section 1).

16.     Following a merger in 2015 of Lafarge S.A. ("Lafarge") and Holcim (the "Lafarge/Holcim Merger"), Holcim became one of the three largest producers and suppliers of Portland cement in the United States.

17.     The purpose of the Cement Supply Agreement is for "the sale and purchase of Portland cement to be used by [Ozinga]." (See Exhibit A, Recital Paragraph, p. 1).  The Cement

Supply Agreement requires Ozinga to purchase a certain minimum quantity of Product during each calendar year (the "Product Purchase Requirement"). (See Exhibit A, Section 3). "Product" is defined in the Cement Supply Agreement as "ordinary bulk Portland Cement Type I/II low alkali and Type 1L that meets the Specifications." (See Exhibit A, Section 1).

18.     The Cement Supply Agreement defines a "Qualified Product" as "Portland cement sold by Qualified Suppliers, of like quality to Product supplied by [Holcim] and meeting the Specifications." (See Exhibit A, Section 1).

<u>Determining a Competitive Price under the Cement Supply Agreement</u>

19.     The Cement Supply Agreement permits Holcim to periodically propose a Product price adjustment by providing advance written notice of same to Ozinga (the "Price Adjustment Notice"). (See Exhibit A, Section 6(b)). If Ozinga disagrees with the price presented in the Price Adjustment Notice, the parties are obligated under the Cement Supply Agreement to negotiate a competitive price, in good faith, for a period of sixty days following the date the price adjustment goes into effect (the "Negotiation Period"). (See Exhibit A, Section 6(d)).

20.     If the parties are unable to arrive at an agreed-upon price during the Negotiation Period, the Cement Supply Agreement permits Holcim to engage an auditor to review Ozinga's relevant books and records to determine a competitive price (the "Competitive Price") for the Product (the "Price Audit"). (See Exhibit A, Section 6(e)). The "Competitive Price" is defined, in part, by the Cement Supply Agreement as "the average price per ST of Product actually paid by [Ozinga] during the Price Audit Period to at least two Qualified Suppliers of [Ozinga] during such period." (See Exhibit A, Section 1). The Cement Supply Agreement defines a "Qualified Supplier", in part, as "any bona fide, third party supplier of Product…that has more than [a certain quantity] of total annualized sales of Qualified Product to [Ozinga] during the applicable Measurement Year." (See Exhibit A, Section 1).

21. The Cement Supply Agreement provides, "The Auditor shall audit Buyer's relevant books and records and shall determine the Competitive Price of Buyer during the Price Audit Period." (See Exhibit A, Section 6(e)(ii)).

22. The Cement Supply Agreement further provides, "The auditor shall submit a final report to Buyer and Seller within 20 Business Days following the Price Audit, specifying the Competitive Price." (See Exhibit A, Section 6(e)(iv)).

23. Portland cement which is not low alkali is, and at all relevant times has been, of like quality to low alkali Portland cement for ready mix concrete production purposes. The pricing in the Relevant Market for Portland cement which is not low alkali is, and at all relevant times has been, comparable to the competitive pricing of Portland cement which is low alkali.

24. At all relevant times from the execution of the Cement Supply Agreement from 2014 through the year 2018, a course of dealing was established when Holcim and Ozinga negotiated the competitive price of Product during the relevant Negotiation Periods by relying, in part, on the prices of Portland cement sold by other suppliers which was not necessarily low alkali but was of comparable quality for Ozinga's ready mix production purposes. One of such other suppliers of Portland cement which was not low alkali ("Cement Supplier A") was also used by Ozinga to support the competitive pricing during the 2019 Negotiation Period without initial objection by Holcim.

25. On the date the Cement Supply Agreement was executed, June 24, 2014, there were only two suppliers in the Relevant Market, other than Holcim, who supplied Portland cement which was low alkali, Lafarge and one other supplier ("Cement Supplier B"). Following the Lafarge/Holcim Merger, Cement Supplier B was the only effective supplier of low alkali Portland cement in the Relevant Market other than Holcim. Thus, due to the LaFarge/Holcim merger, Holcim and Cement Supplier B became the only two effective suppliers of low alkali Portland

6

cement in the Relevant Market, with Holcim maintaining a dominant market share for sales of low alkali Portland cement in the Chicago Metro Area, the Relevant Market as defined by the Cement Supply Agreement.

26.     Each year from the effective date of the Cement Supply Agreement through and including the year 2018, Holcim sent Ozinga a Price Adjustment Notice and then negotiated pricing for Product with Ozinga based, in part, on the price of Portland cement, including non-low alkali Portland cement, sold by other suppliers to Ozinga in the Relevant Market.

27.     Each year from the effective date of the Cement Supply Agreement through and including the year 2018, Ozinga provided a forecast of how much Product Ozinga would purchase from Holcim's various pick-up locations (each, a "Forecast").

28.     On September 18, 2018, Holcim sent Ozinga a Price Adjustment Notice increasing the price of Product to be effective as of January 1, 2019, but ultimately decided to push this price increase back to April 1, 2019, based on market conditions.

29.     Because Holcim's September 18, 2018 Price Adjustment Notice sought a price increase significantly higher than prices paid by Ozinga for like quality Portland cement from other suppliers in the Relevant Market, Ozinga disagreed with Holcim's proposed pricing.

30.     During the 2019 Negotiation Period, Ozinga provided Holcim with its Forecast showing that Ozinga would require delivery of almost its entire Product Purchase Requirement for the next year from the Ste. Genevieve, Missouri delivery location ("Ste. Gen.").

31.     On March 15, 2019, Ozinga notified Holcim of the average competitive price of Ozinga's two (2) chosen Qualified Suppliers of like quality Portland cement which was substantially lower per ton FOB Ste. Gen than the price Holcim sought in its Price Adjustment Notice.  Ozinga identified Cement Supplier A and Cement Supplier B as the Qualified Suppliers.  Cement Supplier A was not a supplier of low alkali Portland cement.  Despite that, Holcim had

accepted each of Cement Supplier A and Cement Supplier B as Qualified Suppliers in all previous competitive pricing negotiations conducted pursuant to the Cement Supply Agreement.

32.     On May 30, 2019, the Price Negotiation Period expired, with Ozinga and Holcim being unable to reach an agreement on price for the Product, for the first time since the Cement Supply Agreement was executed in 2014.

33.     During a phone conversation within a few days after the end of the Price Negotiation Period, Patrick Cleary of Holcim advised Martin Ozinga IV of Ozinga that Holcim would be changing its barge policy at Ste. Gen. to prohibit Ozinga from loading barges at Ste. Gen. in order to force Ozinga to pay Holcim's higher price at its Lemont, IL and Summit, IL terminals. In that phone call, Mr. Cleary made no mention of river issues at the Ste. Gen. terminals as being the reason for the policy change.

34.     Thereafter, on June 12, 2019, Holcim notified Ozinga it would proceed with a Price Audit.

<u>Holcim and Cutrara Conspire to Establish and Maintain Holcim's Anticompetitive Price</u>

35.     Holcim engaged Cutrara to perform the Price Audit.  In their engagement agreement, Holcim directed Cutrara to substantially limit the scope of the Price Audit by determining a Competitive Price only for Holcim's Ste. Gen. location, instead of all of Holcim's pick-up locations, falsely claiming that Ozinga had accepted Holcim's requested price increase at all of Holcim's locations other than Ste. Gen.

36.     On June 17, 2019, Cutrara sent a letter to Ozinga by which Cutrara made clear it had already agreed with Holcim's desired interpretation of the scope of the Price Audit, and requesting certain records from Ozinga.

37.     On June 18, 2019, Ozinga responded to Cutrara's letter and objected to the limited scope of the Price Audit which Cutrara and Holcim had decided to perform.

38.     On June 21, 2019, Holcim gave notice of its unilateral change in its barge policy at Ste. Gen. for Ozinga, limiting the number of Ozinga barges Holcim would load with Product to only one per week.  Such change forced Ozinga to pick up Portland cement at Holcim's other locations to meet Ozinga's Product Purchase Requirement, in contravention of Ozinga's 2019 Forecast and at substantially greater cost to Ozinga.  Holcim initially claimed that this change in barge policy was due to high water conditions on the Mississippi River, despite the fact that such high-water conditions had subsided prior to this June 21, 2019 notice.

39.     A few days after the June 21, 2019 notice, Holcim's true reason for changing its barge policy with respect to Ozinga was revealed when Patrick Cleary from Holcim notified Martin Ozinga IV that Holcim would increase its maximum barge loads at Ste. Gen. for Ozinga if Ozinga agreed to a price only slightly less than Holcim's requested price increase.

40.     On July 9, 2019, Holcim directed Cutrara to audit all of Holcim's pick-up locations, but only if Ozinga agreed not to use Cement Supplier A as one of the Qualified Suppliers for purposes of the Price Audit.

41.     On July 22, 2019, Ozinga again asked Holcim to resolve the dispute over interpretation of terms in the Cement Supply Agreement which were previously raised by Ozinga. Holcim again refused, and demanded that Cutrara construe the terms consistent with its (Holcim's) interpretation, which was and is inconsistent with their commonly understood meanings in the industry and Holcim's and Ozinga's course of dealing.

42.     On August 8, 2019, Cutrara informed Ozinga that Cutrara intended to accept Holcim's interpretation of the terms of the Cement Supply Agreement and scope of the Price Audit.

43.     On August 12, 2019, for the first time, Cutrara advised that only low alkali Portland cement purchases would be considered by Cutrara in calculating the Competitive Price, thereby adopting Holcim's interpretation of Qualified Product as being limited only to low alkali Portland

cement. Holcim and Cutrara took this position with full knowledge that only one supplier of low alkali Portland cement remained in the Relevant Market following the Lafarge/Holcim Merger. Four days later, Cutrara commenced the Price Audit.

44.     From August 12 to August 16, 2019, Ozinga informed Cutrara on more than one occasion that the Cement Supply Agreement and course of dealing between Ozinga and Holcim did not limit a determination of Competitive Price to low alkali Portland cement.

45.     On August 16, 2019, Cutrara commenced the Price Audit.

46.     On August 30, 2019, Cutrara provided the Cutrara report to Holcim only. This report made clear that Cutrara conspired with Holcim, before conducting the Price Audit, that Cutrara would conclude it could not determine a Competitive Price and that there would be no adjustment to Holcim's arbitrary and anticompetitive price for Portland cement.

47.     Holcim has issued price adjustment notices to be effective in 2020 to its customers other than Ozinga in the Relevant Market. However, for the first time during the term of the Cement Supply Agreement, Holcim has failed to provide Ozinga, its largest customer in the Relevant Market, with a price adjustment notice to be effective in 2020. Upon information and belief, Holcim has done this to prevent competitive pricing negotiation with Ozinga, and to lock in Ozinga, through the end of the Cement Supply Agreement in 2024, at Holcim's desired arbitrary and anticompetitive pricing as established by the 2019 Price Adjustment Notice.

<u>The Most Favored Price Provision and Holcim's Unlawful Price Discrimination</u>

48.     Contemporaneous with charging Ozinga an anticompetitive price for Portland cement, Holcim has decided to sell less cement in the Relevant Market to other ready mix concrete customers so that the most favored pricing provisions of the Cement Supply Agreement will not frustrate the arbitrary and anticompetitive price for Portland cement which Holcim has dictated to Ozinga.

49.     Section 5(h) of the Cement Supply Agreement provides that "the Sales Price shall at all times be equal to or less than the lowest price at which Seller has sold Product at the same time, within the Chicago Metro Area and Lake County, Indiana, to other fixed-location ready-mix concrete customers, excluding any project work, paving discounts, or spot prices (as applicable, the 'Most Favored Price')".  (Exhibit A, Section 5(h)).

50.     Upon information and belief, for at least two years, Holcim has entered into product swap or barter agreements or arrangements with Competitor A, a direct competitor of Ozinga's in the Chicago Metro Area, and pursuant thereto has supplied Competitor A with Portland cement in exchange for comparable Portland cement from Competitor A in the Milwaukee, Wisconsin market.  Upon further information and belief, Holcim has produced invoices for the Portland cement swapped or exchanged with Competitor A to reflect an invoice price at or above the anticompetitive price charged by Holcim to Ozinga under the Cement Supply Agreement, when in reality the Portland cement is being swapped or exchanged with Competitor A at or near cost, which is substantially less than the anticompetitive price charged by Holcim to Ozinga under the Cement Supply Agreement.

51.     Upon information and belief, the purpose for "charging" Competitor A an invoice price at or above the anticompetitive price charged by Holcim to Ozinga under the Cement Supply Agreement is to avoid triggering the Most Favored Price clause of the Cement Supply Agreement.

52.     Upon information and belief, the Portland cement swapped or exchanged with Competitor A pursuant to these product swap or barter agreements is and has been of like quality to the Portland cement sold to Ozinga pursuant to the Cement Supply Agreement.

53.     By charging Ozinga the anticompetitive price for Portland cement pursuant to the Cement Supply Agreement and contemporaneously only charging a "net" (at or near cost) price to

Competitor A pursuant to their product swap or barter agreements, Holcim has unlawfully discriminated its pricing in violation of the Robinson Patman Act, 15 U.S.C. § 13(a).

## COUNT I
### Sherman Act Section One – Conspiracy to Unlawfully Restrain Trade Against Holcim and Cutrara

54.     Ozinga restates and realleges the foregoing allegations of paragraphs 1-53 as if fully set forth herein as paragraphs 1-53 of Count I.

55.     Section 1 of the Sherman Act, 15 U.S.C. § 1, declares that every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations, is declared to be illegal.

56.     This Count is brought pursuant to 15 U.S.C. § 4, which vests district courts with jurisdiction to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as 15 U.S.C. § 15(a), which allows suit for damages by persons injured in their business or property by reason of anything forbidden by the antitrust laws.

57.     Holcim's merger with LaFarge resulted in only two suppliers capable of supplying quantities of low alkali Portland cement in the Chicago Metro Area sufficient to qualify as Qualified Suppliers as defined by the Cement Supply Agreement, one of which is Holcim, which has a dominant share for sales of that product in the Chicago Metro Area.

58.     Despite the fact that the relevant product market is for Portland cement, as commonly understood, Holcim has recently taken the position that there is a separate product market for low alkali Portland cement.

59.     In actuality, ready-mix concrete producers can utilize low alkali or non-low alkali Portland cement to produce their product, and low alkali and non-low alkali Portland cement are generally interchangeable and are substitutes for one another in the context of producing ready-mix concrete.

60.     Holcim conspired with Cutrara to unlawfully restrain trade and to establish and maintain Holcim's anticompetitive price charged to Ozinga by entering into an agreement with Holcim whereby Cutrara was paid by Holcim to review the books and records of Ozinga under the guise of making a determination of Competitive Price.  Cutrara agreed with Holcim before commencing the Price Audit that there was only one Qualified Supplier of Product and that Cutrara would not consider cement of "like quality" as required by the Cement Supply Agreement.

61.     Cutrara conspired with Holcim to issue a report opining that it could not determine a Competitive Price, thereby facilitating and assisting Holcim in setting its unreasonably high anticompetitive pricing for Portland cement sold to Ozinga.

62.     By conspiring to set, impose and maintain an anticompetitive price for Portland cement, in violation of Section 1 of the Sherman Act, Holcim and Cutrara have caused anticompetitive harm which the antitrust laws were designed to prevent.

63.     Ozinga has been injured and damaged by Holcim and Cutrara's unlawful restraint of trade, in that it has been forced to pay anticompetitive prices for Portland cement purchased from Holcim, rather than a competitive price established by the free market which is, upon information and belief, as much as 40% less.

64.     Such violation and effects thereof are continuing and will continue unless injunctive relief issues in the form of mandating and declaring that suppliers of Portland cement which is not low alkali may be used to determine Competitive Price, and that Portland cement which is not low alkali is of like quality to the Product.  Such injunctive relief must further restrain Holcim and Cutrara from engaging in any conduct to unlawfully restrain trade in violation of Section 1 of the Sherman Act.

13

65.     In addition, Ozinga is entitled to an award of damages from Holcim and Cutrara in a sum to be proven at trial, to be trebled according to the law, plus interest, attorneys' fees and costs of suit.

66.     Ozinga demands trial by jury.

WHEREFORE, Plaintiffs, Ozinga Bros., Inc. and Ozinga Cement, Inc., respectfully pray as follows:

A.     That this Court declare that the Cement Supply Agreement permits the pricing of suppliers of Portland cement which is not low alkali to form the basis of a Competitive Price;

B.     That this Court issue a permanent injunction against Defendants, Holcim (US) Inc., and Cutrara & Company Professional Corporation, restraining and enjoining said Defendants from, in any manner, directly or indirectly, committing violations of Section 1 of the Sherman Act in which they have been engaged;

C.     That this Court enter a judgment in favor of plaintiffs Ozinga Bros, Inc., and Ozinga Cement, Inc., and against each of the Defendants, Holcim (US) Inc., and Cutrara & Company, Professional Corporation, in an amount of damages sustained by Plaintiffs as a result of Defendants' violations of Section 1 of the Sherman Act to be proven at trial, to be trebled according to law, plus interest, attorneys' fees and costs of suit; and

D.     That this Court award such other relief as this Court may deem just and equitable.

## COUNT II
## <u>Breach of Contract – Against Holcim</u>

67.     Ozinga restates and realleges the foregoing allegations of paragraphs 1-66 of this Complaint as if fully set forth herein as paragraphs 1-66 of Count II.

14

68.     Section 6(d) of the Cement Supply Agreement expressly obligates each of Holcim and Ozinga to "negotiate in good faith" following a dispute of Holcim's proposed price adjustment to resolve such dispute by review of Ozinga's competitive pricing from suppliers of Product of like quality.

69.     Prior to the Holcim proposed price adjustment to be effective April 1, 2019, negotiations between Holcim and Ozinga to resolve price disputes always involved review by Holcim of pricing in part from suppliers in the Relevant Market of Portland cement which was not low alkali.

70.     Such negotiations evidence a course of dealing between or past performance by Holcim and Ozinga to establish under the Cement Supply Agreement that Portland cement which was not low alkali was of like quality to the Product and suppliers to Ozinga of Portland cement which was not low alkali would be considered "Qualified Suppliers" for competitive pricing purposes.

71.     Holcim and Ozinga have also entered into a cement supply agreement for supply of Portland cement in the Wisconsin market (the "Wisconsin Supply Agreement"). The Wisconsin Supply Agreement contains identical terms to those in the Cement Supply Agreement concerning the definitions of "Product" and "Qualified Suppliers" and the negotiation and establishment of competitive pricing following a price adjustment notice from Holcim. Throughout the term of the Wisconsin Supply Agreement, Holcim has supplied Product which is not low alkali, has recognized such Product towards satisfaction of Ozinga's minimum purchase requirements, and has accepted other suppliers of non-low alkali Product to Ozinga as Qualified Suppliers. Such administration of the Wisconsin Supply Agreement also evidences a course of dealing between Holcim and Ozinga to establish under the identical Cement Supply Agreement that Portland cement which was not low alkali was of like quality to the Product and suppliers to Ozinga of

Portland cement which was not low alkali would be considered "Qualified Suppliers" for competitive pricing purposes.

72.    Holcim failed to negotiate in good faith and failed to use good faith and fair dealing to comply with the Cement Supply Agreement in order to resolve the dispute over Holcim's proposed price adjustment to be effective April 1, 2019, as set forth in detail above, including by:

   a.   Taking the position in August 2019, for the first time during the term of the Cement Supply Agreement, that Holcim would not consider or negotiate concerning Ozinga's competitive pricing because it did not involve two suppliers of low alkali Portland cement, with full knowledge that only one other supplier of low alkali Portland cement in the Relevant Market existed after the Lafarge/Holcim Merger;

   b.   By halting and then severely limiting deliveries of Portland cement at Ste. Gen. to Ozinga after Ozinga provided its 2019 Forecast indicating that Ozinga would take most of its deliveries of Portland cement at Ste. Gen., and then conditioning the lifting of such delivery restrictions on Ozinga conceding to Holcim's unreasonably high, anticompetitive pricing;

   c.   By conspiring with and paying Cutrara to refuse to consider Qualified Suppliers of Portland cement of like quality in its review of Ozinga's records under the guise of performing a Price Audit to determine a Competitive Price, and issue a written report which failed to determine any Competitive Price in order to support Holcim's anticompetitive price charged to Ozinga.

73.    Holcim's failure to negotiate and perform in good faith and consistent with fair dealing constitutes a material breach of the Cement Supply Agreement by Holcim. As a result of such breach, Ozinga has sustained damages as a result of being required to purchase Portland

cement from Holcim at Holcim's arbitrary and anticompetitive price, rather than a competitive price established by the market which is substantially less.

74.     Pursuant to Section 15(d) of the Cement Supply Agreement, Ozinga is entitled to recover from Holcim all fees and costs in bringing this action by reason of Holcim's breach of the Cement Supply Agreement, including without limitation, attorneys' fees and other costs of this litigation.

75.     Ozinga demands trial by jury.

WHEREFORE, Plaintiffs, Ozinga Bros., Inc. and Ozinga Cement, Inc. respectfully pray as follows:

A.     That this Court enter a judgment in favor of Plaintiffs, Ozinga Bros, Inc., and Ozinga Cement, Inc., and against the Defendant, Holcim (US) Inc., in an amount of damages sustained by Plaintiffs as a result of said Defendant's breach of the Cement Supply Agreement to be proven at trial, plus attorneys' fees and other costs of suit; and

B.     That this Court award such other relief as this Court may deem just and equitable.

## COUNT III
## Declaratory Judgment – Against Holcim

76.     Ozinga restates and realleges the foregoing allegations of paragraphs 1-75 of this Complaint as if fully set forth herein as paragraphs 1-75 of Count III.

77.     An actual controversy exists between Plaintiffs, Ozinga Bros., Inc., and Ozinga Cement, Inc., and Defendant, Holcim (US) Inc., concerning whether Portland cement which is not low alkali is of like quality to the Product such that suppliers of such Portland cement to Ozinga would be considered Qualified Suppliers under the Cement Supply Agreement.

78.     By the terms and provisions of section 2-701 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-701, this Court is vested with the authority to declare the rights of the parties hereto relative to such actual controversy and to grant such further and other relief as may be necessary.

17

79.     In the event the Court determines that a Competitive Price cannot be determined under the Cement Supply Agreement as written, and to avoid impossibility of performance by Ozinga, and payment by Ozinga of unreasonably high, anticompetitive pricing in contradiction of the parties course of dealing and past performance under the Cement Supply Agreement, the Cement Supply Agreement should be declared to be reformed to permit pricing of suppliers of Portland cement which is not low alkali to form the basis of a Competitive Price and to consider Portland cement which is not low alkali as being of like quality to the Product, or permit the use of only one other supplier of low alkali cement for the purposes of establishing a Competitive Price.

80.     Ozinga demands trial by jury.

WHEREFORE, Plaintiffs, Ozinga Bros., Inc. and Ozinga Cement, Inc. respectfully pray as follows:

A.      That this Court declare that the Cement Supply Agreement as drafted permits pricing of suppliers of Portland cement which is not low alkali to form the basis of a Competitive Price and to consider Portland cement which is not low alkali as being of like quality to the Product, or alternatively declare said Cement Supply Agreement is reformed as such, or permit the use of only one other supplier of low alkali cement for the purposes of establishing a Competitive Price;

B.      That this Court declare that a capable auditor, other than Cutrara, be engaged at Holcim's expense to review Ozinga's books and records including non-low alkali cements as qualified competitive sources and determine competitive pricing based on such review at all delivery locations effective April 1, 2019, implementing the determined competitive pricing in accordance with the provisions of the Cement

Supply Agreement in comparison to the price adjustment proposed by Defendant, Holcim (US) Inc., to be effective April 1, 2019; and

C.    That this Court award such other relief as this Court may deem just and equitable.

## COUNT IV
## Tortious Interference with Contract by Cutrara

81.    Ozinga restates and realleges the foregoing allegations of paragraphs 1-80 of this Complaint as if fully set forth herein as paragraphs 1-80 of Count IV.

82.    At the time Holcim hired Cutrara to purportedly act as the auditor to make a determination of Competitive Price in connection with the Price Audit described in the Cement Supply Agreement, Cutrara was made fully aware of the terms and conditions of the Cement Supply Agreement.

83.    Prior to conducting a review of Ozinga's books and records, Cutrara agreed with Holcim that it would conclude in a written report that it would not identify a Competitive Price nor complete the Price Audit due to its contrived inability to identify two Qualified Suppliers within the meaning of the Cement Supply Agreement.

84.    Cutrara's agreement with Holcim to not establish a Competitive Price, prior to issuing its final Price Audit report and then in issuance of its final report, facilitated and assisted in a tortious manner Holcim's breach of the Cement Supply Agreement.

85.    Cutrara intentionally and without legal justification facilitated and assisted Holcim in and further induced Holcim to breach its valid and enforceable Cement Supply Agreement with Ozinga.

86.    As a direct and proximate result of Cutrara's tortious conduct, Holcim completed its breach of the Cement Supply Agreement resulting in pecuniary damage to Ozinga due to injury to its business and property.

87.    Ozinga demands trial by jury.

WHEREFORE, Plaintiffs, Ozinga Bros., Inc. and Ozinga Cement, Inc., respectfully pray as follows:

A. That this Court enter a judgment in favor of Plaintiffs, Ozinga Bros, Inc. and Ozinga Cement, Inc., and against the Defendant, Cutrara & Company, Professional Corporation, in an amount of damages sustained by Plaintiffs as a result of said Defendant's tortious interference with the Cement Supply Agreement to be proven at trial, plus attorneys' fees and other costs of suit; and

B. That this Court award such other relief as this Court may deem just and equitable.

## COUNT V
### Robinson Patman Act Against Holcim

88. Ozinga restates and realleges the foregoing allegations in paragraphs 1-87 of this Complaint as if fully set forth herein as paragraphs 1-87 of Count V.

89. Section 2(a) of the Robinson Patman Act, 15 U.S.C. § 13(a), provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale … and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

90. This Count is brought pursuant to 15 U.S.C. § 15(a), which allows suit for damages by persons injured in their business or property by reason of anything forbidden by the antitrust laws, and 15 U.S.C. § 26, which provides that any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including 15 U.S.C. § 13.

91.    Holcim has directly or indirectly sold Portland cement, and upon information and belief low-alkali Portland cement, to both Ozinga and Competitor A over the course of at least the last two years, which sales were made in interstate commerce.

92.    Upon information and belief, the Portland cement product which Holcim has sold to Ozinga and Competitor A over the course of at least the last two years has been of the same or like grade or quality.

93.    Holcim, by directly or indirectly  selling Portland cement product to Competitor A pursuant to a product swap or barter arrangement at a net price which is at or near cost, while contemporaneously selling Portland cement to Ozinga at an arbitrary and anticompetitive price which upon information and belief is and has been at least 40% higher, has discriminated in price as between Ozinga and Competitor A.

94.    Upon information and belief, the underlying purpose of Holcim's direct or indirect product swap or barter arrangement with Competitor A, including the issuance of invoices reflecting a sales price at or above the price charged Ozinga for Product, has been to circumvent and avoid the Most Favored Price provision of the Cement Supply Agreement between Holcim and Ozinga.

95.    In reality, upon information and belief, the net price for the product swapped with Competitor A is Holcim's cost or very near Holcim's cost, rather than the contrived and inflated price reflected on invoices produced and issued to Competitor A.

96.    Upon information and belief, Holcim's direct or indirect product swap or barter arrangement with Competitor A has been designed to avoid Robinson Patman Act liability and foster and facilitate the arbitrary and anticompetitive price for Product charged to Ozinga under the Cement Supply Agreement.

97.     Ozinga has been injured and damaged by Holcim's violations of the Robinson Patman Act because Holcim's discrimination against Ozinga has forced Ozinga to pay arbitrary and anticompetitive prices for like or comparable product sold to Competitor A at significantly lower actual (i.e., "net") prices, upon information and belief as much as 40% less.

98.     Holcim's unlawful price discrimination has also had a prohibited effect on competition, in particular maintenance of an anticompetitive pricing scheme imposed upon Ozinga, an effect the antitrust laws were designed to prevent.

99.     Ozinga demand trial by jury.

WHEREFORE, Plaintiffs, Ozinga Bros., Inc. and Ozinga Cement, Inc., respectfully pray as follows:

A.      That this Court enter a judgment in favor of plaintiffs Ozinga Bros, Inc., and Ozinga Cement, Inc., and against the Defendants, Holcim (US) Inc., in an amount of damages sustained by Plaintiffs as a result of Defendant's violations of the Robinson Patman Act to be proven at trial, to be trebled according to law, plus interest, attorneys' fees and costs of suit;

B.      That this Court issue a permanent injunction against Defendant, Holcim (US) Inc., restraining and enjoining said Defendant from, in any manner, directly or indirectly committing violations of the Robinson Patman Act in which it has been engaged; and

C.      That this Court award such other relief as this Court may deem just and equitable.

Respectfully submitted,

Ozinga Bros., Inc. and Ozinga Cement, Inc.

By: ___ /s/ Timothy S. Breems, Sr. _____
      One of their attorneys

Timothy S. Breems, Sr.
Scott Nelson
Paul N. Reidy
Ruff, Freud, Breems & Nelson Ltd.
200 N. LaSalle Street, Suite 2020
Chicago, IL  60601
tbreems@rfbnlaw.com
snleson@rfbnlaw.com
paulreidy@rfbnlaw.com

Richard S. Porter
Michael F. Iasparro
Hinshaw & Culberston LLP
100 Park Avenue
P.O. Box
Rockford, IL  61105
rporter@hinshawlaw.com
miasparro@hinshalwlaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Ozinga Bros., Inc., an Illinois corporation, and Ozinga Cement, Inc., formerly known as Chicago Cement, Inc., an Illinois corporation | ) ) ) |
| | ) Case No.  19 CV 7825 |
| Plaintiff, | ) |
| | ) Judge: |
| vs. | ) |
| | ) Magistrate Judge: |
| Holcim (US) Inc., a Delaware corporation, and Cutrara & Company, Professional Corporation, an Illinois corporation | ) ) ) |
| | ) |
| Defendants | ) PLAINTIFFS DEMAND TRIAL BY JURY |

**<u>EXHIBIT A TO COMPLAINT</u>**
(Subject to Motion to File Under Seal)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Ozinga Bros., Inc., an Illinois corporation, and | ) | |
| Ozinga Cement, Inc., formerly known as | ) | |
| Chicago Cement, Inc., an Illinois corporation | ) | |
| | ) | Case No.  19 CV 7825 |
| Plaintiff, | ) | |
| | ) | Judge: |
| vs. | ) | |
| | ) | Magistrate Judge: |
| Holcim (US) Inc., a Delaware corporation, and | ) | |
| Cutrara & Company, Professional | ) | |
| Corporation, an Illinois corporation | ) | |
| | ) | |
| Defendants | ) | PLAINTIFFS DEMAND TRIAL BY JURY |


## EXHIBIT B TO COMPLAINT
(Subject to Motion to File Under Seal)